# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**ANTHONY S. CHURCHWARD**
Leonard, Hammond, Thoma & Terrill
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
**KYLE HUNTER**
Deputies Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

|                        |     |                      |
|------------------------|-----|----------------------|
| TERRENCE J. FUQUA,     | )   |                      |
|                        | )   |                      |
| Appellant-Defendant,   | )   |                      |
|                        | )   |                      |
| vs.                    | )   | No. 02A03-1207-CR-342 |
|                        | )   |                      |
| STATE OF INDIANA,      | )   |                      |
|                        | )   |                      |
| Appellee-Plaintiff.    | )   |                      |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Wendy W. Davis, Judge
Cause No. 02D05-1112-FA-65

**March 27, 2013**

**OPINION – FOR PUBLICATION**

**MATHIAS, Judge**

Terrence Fuqua ("Fuqua") was convicted in Allen Superior Court of Class A felony dealing in cocaine, Class B felony unlawful possession of a firearm by a serious violent felon, Class D felony possession of a controlled substance, Class D felony dealing in marijuana, and Class A misdemeanor possession of paraphernalia. Fuqua challenges his convictions and raises two issues on appeal:

I. Whether law enforcement officers had reasonable suspicion to search Fuqua's trash; and,

II. Whether the warrant authorizing the search of Fuqua's residence was supported by probable cause.

We affirm.[1]

**Facts and Procedural History**

In October 2011, Fort Wayne Detective Darrick Engelman ("Detective Engelman") interviewed Stephanie McCarter and Donald Stovall, both of whom had been arrested in connection with a cocaine dealing investigation, first separately and then together. McCarter identified Fuqua and James Holman (a.k.a. "Petey") as her cocaine dealers and told the detective where Fuqua lived. Stovall also stated that Fuqua was his cocaine dealer. Shortly thereafter, McCarter executed a controlled buy with Holman, who was arrested as a result of that transaction.

On November 7, 2011, another Fort Wayne Detective, Darin Strayer ("Detective Strayer") received an anonymous phone tip, and the caller reported that she observed Fuqua with a large amount of cash at his residence and a hidden compartment for the

---

[1] We held oral argument in this case at Hamilton Southeastern High School in Fishers, Indiana on March 13, 2013. We thank the administration, faculty, students, and staff for their hospitality.

money in the floor of the back bedroom. The anonymous tipster also stated that she observed an individual named Petey arrive at Fuqua's residence with a large amount of cocaine. Because Detective Engelman's desk is near Detective Strayer's, Detective Engelman overheard Detective Strayer's discussion concerning Fuqua, and the two detectives shared their separately acquired knowledge of Fuqua's activities.

The next day, the detectives drove by Fuqua's residence to perform surveillance. Fuqua had placed his trash outside near his detached garage to be collected by a garbage service, and other residents in the neighborhood had done the same. Detective Engelman quickly collected two bags of Fuqua's trash, which the detectives looked through after they returned to their office. In Fuqua's trash they found crack pipes, three empty boxes of baking soda (which they knew to be useful in processing cocaine into crack cocaine), and several plastic baggies containing a white powdery substance that tested positive for cocaine.

The detectives continued to perform surveillance of Fuqua's residence and observed activities consistent with narcotics trafficking, such as vehicles arriving at the residence and leaving after just a few minutes and the possibility of pedestrian lookouts. During one such surveillance, the anonymous informant who spoke to Detective Strayer rode with the detectives[2] and identified Fuqua's residence, Holman, and Holman's residence.

---

[2] There is no evidence in the record that the detectives obtained any identifying information regarding the anonymous informant during the "ride along."

On November 22, 2011, Detective Strayer applied for and obtained a warrant to search Fuqua's residence. During execution of the warrant, law enforcement officers discovered significant amounts of cocaine, marijuana, scales, plastic baggies, large amounts of cash, paraphernalia and a firearm. Fuqua was charged with Class A felony dealing in cocaine, Class B felony unlawful possession of a firearm by a serious violent felon, Class D felony possession of a controlled substance, Class D felony dealing in marijuana, and Class A misdemeanor possession of paraphernalia.

Fuqua filed a motion to suppress all evidence seized during the execution of the search warrant arguing that the affidavit accompanying the warrant failed to state sufficient facts to establish probable cause and the trash search was not supported by reasonable suspicion. Fuqua's motion was denied, as was his request for certification of an interlocutory order for the purposes of appeal.

A bench trial was held on June 14, 2012, and the trial court found Fuqua guilty as charged. Fuqua was ordered to serve an aggregate forty-year sentence in the Department of Correction. Fuqua now appeals.

**Standard of Review**

Questions regarding the admission of evidence are left to the sound discretion of the trial court, and on appeal, we review the court's decision only for an abuse of that discretion. Wells v. State, 904 N.E.2d 265, 269 (Ind. Ct. App. 2009), trans. denied. The trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law. Id. Our review of rulings on the admissibility of evidence is essentially the same regardless of

4

whether the challenge is made through a pretrial motion to suppress or by an objection at trial. Jackson v. State, 890 N.E.2d 11, 15 (Ind. Ct. App. 2008). We will not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling. Id. However, we also consider any undisputed evidence that is favorable to the defendant. Id. Additionally, we may consider foundational evidence introduced at trial in conjunction with any evidence from a suppression hearing that is not in direct conflict with the trial evidence. Kelley v. State, 825 N.E.2d 420, 427 (Ind. Ct. App. 2005).

### I. Trash Search

Although the search and seizure provision found in Article I, Section 11 of the Indiana Constitution tracks the Fourth Amendment verbatim, our jurisprudence has focused on whether the actions of the government were "reasonable" under the "totality of the circumstances." Litchfield v. State, 824 N.E.2d 356, 359 (Ind. 2005). In some cases, Article I, Section 11 confers greater protections to individual rights than the Fourth Amendment affords. Holder v. State, 847 N.E.2d 930, 940 (Ind. 2006); Litchfield, 824 N.E.2d at 358-59. For this reason, in Litchfield, our supreme court held:

> A search of trash recovered from the place where it is left for collection is permissible under the Indiana Constitution, but only if the investigating officials have an articulable basis justifying reasonable suspicion that the subjects of the search have engaged in violations of law that might reasonably lead to evidence in the trash.

824 N.E.2d at 357.

The court set out a two-part test for determining whether a trash search is reasonable. First, the "trash must be retrieved in substantially the same manner as the

5

trash collector would take it." Id. at 363. Second, the search must be based on an "articulable individualized suspicion that illegal activity is or has been taking place, essentially the same as is required for a '*Terry* stop' of an automobile." Id. at 364. Fuqua does not contest the manner in which his trash was seized, but argues solely that the detectives lacked reasonable suspicion to search his trash.

The reasonable suspicion determination is reviewed de novo on appeal. Teague v. State, 891 N.E.2d 1121, 1128 (Ind. Ct. App. 2008). Reasonable suspicion exists if the facts known to the officer and the reasonable inferences therefrom would cause an ordinarily prudent person to believe that criminal activity has or is about to occur. State v. Lefevers, 844 N.E.2d 508, 515 (Ind. Ct. App. 2006), trans. denied. "Although reasonable suspicion requires more than inchoate and unparticularized hunches, it is a less demanding standard than probable cause and requires considerably less proof than that required to establish wrongdoing by a preponderance of the evidence." Id.; see also Washburn v. State, 868 N.E.2d 594, 598 (Ind. Ct. App. 2007) (stating that reasonable suspicion requires at least a minimal level of objective justification and must be based on more than an inchoate and unparticularized suspicion or "hunch" of criminal activity), trans. denied. A determination of reasonable suspicion is made on a case-by-case basis by looking at the totality of the circumstances. Lefevers, 844 N.E.2d at 515.

Detectives Engelman and Strayer suspected that Fuqua was dealing cocaine after Detective Engelman interviewed McCarter and Stovall, who were arrested in connection with a cocaine dealing investigation, and after Detective Strayer received the anonymous tip about the drug activities of Holman and Fuqua. Fuqua argues that the informants'

6

statements lacked credibility, and the informants' and anonymous tipster's statements were uncorroborated on the date of the trash pull. Ultimately, Fuqua claims that "it cannot be said that [the detectives] possessed any reasonable suspicion to justify" the trash pull. Appellant's Br. at 18.

Fuqua correctly observes that "an anonymous tip is not enough to support the reasonable suspicion necessary for a '*Terry*' stop." Wells v. State, 772 N.E.2d 487, 490 (Ind. Ct. App. 2002) (citation omitted). Instead, "[a]nonymous tips must be accompanied by specific indicia of reliability or must be corroborated by a police officer's own observations to pass constitutional muster." Id. Our courts have specifically concluded that an anonymous tip, by itself, without further corroboration, will not support a finding of reasonable suspicion to support a trash search. See, e.g., Sellmer v. State, 842 N.E.2d 358, 361 (Ind. 2006); Richardson v. State, 848 N.E.2d 1097, 1103 (Ind. Ct. App. 2008), trans. denied.

However, "a tip from an identified and known informant can provide reasonable suspicion of criminal activity to justify a *Terry* stop when there are sufficient indicia of reliability." Membres v. State, 889 N.E.2d 265, 281 (Ind. 2008).

> The indicia of reliability for a tip can be established in a number of ways, including whether: (1) the informant has given correct information in the past, (2) independent police investigation corroborates the informant's statements, (3) some basis for the informant's knowledge is demonstrated, or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted.

Id.

7

In this case, the anonymous informant told Detective Strayer that she was at Fuqua's residence on November 6, 2011. She referred to Fuqua by his first name and gave his physical description. The informant stated that Fuqua retrieved approximately $10,000 in cash from an area in the floor underneath a speaker. The informant also stated that Fuqua kept money in a kitchen cabinet in a Walmart bag. She told the detective that "Petey" also arrived at Fuqua's home that day with a black garbage bag containing what she believed to be large amounts of cocaine. Mot. to Suppress Hearing Tr. p. 42. The informant tried to provide "Petey's" address, but gave the incorrect house number. The officers believed that "Petey" was actually James Holman. Id. at 43. A few weeks prior, Detective Strayer had been involved in a controlled buy at Holman's residence. Id. at 44.

But the trash pull was not based solely on the anonymous tip. On October 13, 2011, a few weeks prior to the tip, Detective Engelman interviewed Stephanie McCarter and Donald Stovall, who had been arrested in connection with a cocaine dealing investigation. McCarter identified Fuqua and Holman as her cocaine dealers. She stated that Fuqua and Holman worked together and that they were close friends. Id. 22. McCarter and Stovall, who were romantically involved, were initially interviewed separately. McCarter was cooperative with the detective and agreed to assist in the dealing investigation. McCarter gave Detective Engelman information that was consistent with information known to the detective prior to McCarter's arrest. Id. at 16. McCarter admitted to dealing cocaine and told the detective that her suppliers were Fuqua and Holman. McCarter was not jailed on October 13 because she agreed to

8

become a confidential informant. A few days later, McCarter successfully set up and executed a controlled buy with Holman, who was arrested as a result of that transaction.[3]

Separately, Stovall also told Detective Engelman that he "could purchase cocaine from Terrence Fuqua." Id. at 17. Like McCarter, Stovall was cooperative and provided information to the detective that was consistent with information obtained during the detective's cocaine dealing investigation. Detective Engelman testified that Stovall was likely cooperating in exchange for leniency on his case. Id. at 18. The detective had previously interviewed Stovall on several occasions concerning other investigations and had promised him leniency in the past. Detective Engelman stated that he made no "suggestion[] about how lenient [the detective] might be with reference to his case" and that Stovall knew he would be going to jail that day. Id. at 19.

After Detective Engelman overheard portions of Detective Strayer's November 7, 2011 phone call with the anonymous informant, the detective shared the information he received from McCarter and Stovall. The next day, the detectives performed the trash search at issue in this appeal.

McCarter and Stovall told the detective that Fuqua was their cocaine dealer, demonstrating a basis for their knowledge of Fuqua's illegal activities. McCarter also successfully completed a controlled buy from Holman, who was alleged to be Fuqua's partner; therefore, the detectives were able to corroborate important information supplied by McCarter.

---

[3] However, Detective Engelman also testified that there is now a warrant for McCarter's arrest because "she didn't follow through on evidencing that she agreed to do as a confidential informant." Tr. p. 30.

9

The detectives shared and compiled the information received from the anonymous informant, McCarter, and Stovall prior to searching Fuqua's trash. The anonymous tipster's statements were consistent with those provided by Stovall and McCarter. Detective Engelman's dealing investigation revealed information leading to McCarter's and Stovall's arrest. The information relayed to the detectives by all three informants was enough for the detectives to reasonably suspect that Fuqua was engaged in criminal activity. Given the totality of these circumstances, the trash search in this case was constitutionally permissible.

## II. Probable Cause

Fuqua also argues that there was "no probable cause to serve [as] a basis for the search warrant as the informants relied upon were not credible." Appellant's Br. at 20. A warrant and its underlying affidavit must comply with the Fourth Amendment prohibition on unreasonable searches and seizures, as well as Indiana constitutional and statutory law. Gray v. State, 758 N.E.2d 519, 521 (Ind. 2001). The constitutional principles of Article I, Section 11 and the Fourth Amendment are codified in Indiana Code section 35-33-5-2, which details the information to be contained in an affidavit for a search warrant.

The issuance of a search warrant must be supported by probable cause. Mehring v. State, 884 N.E.2d 371, 376 (Ind. Ct. App. 2008), trans. denied. "Probable cause is a 'fluid concept incapable of precise definition . . . [and] is to be decided based on the facts of each case.'" Id. "In deciding whether to issue a search warrant, the issuing magistrate's task is simply to make a practical, common-sense decision whether, given all

the circumstances set forth in the affidavit, there is a fair probability that evidence of a crime will be found in a particular place." Casady v. State, 934 N.E.2d 1181, 1188-89 (Ind. Ct. App. 2010), trans. denied.

The duty of a reviewing court is to determine whether the issuing magistrate had a substantial basis for concluding that probable cause existed. Id. at 1189. We review the question de novo, but give significant deference to the issuing magistrate's determination and focus on whether reasonable inferences drawn from the totality of the evidence support the finding of probable cause. Id. "In determining whether an affidavit provided probable cause for the issuance of a search warrant, doubtful cases are to be resolved in favor of upholding the warrant." Id. "Probable cause to search a premises 'is established when a sufficient basis of fact exists to permit a reasonably prudent person to believe that a search of those premises will uncover evidence of a crime.'" Helsley v. State, 809 N.E.2d 292, 295 (Ind. 2004) (citations omitted).

Fuqua challenges the probable cause finding by reiterating his argument that the anonymous informant's and confidential informants' hearsay statements were not reliable and credible. Where a warrant is sought based on hearsay information, the affidavit must either: (1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or (2) contain information that establishes that the totality of the circumstances corroborates the hearsay. State v. Spillers, 847 N.E.2d 949, 953-54 (Ind. 2006) (citing Ind. Code § 35-33-5-2(b)(1) and (2)). The trustworthiness of hearsay for the purpose of proving probable cause can be established in several ways, including

11

where: (1) the informant has given correct information in the past, (2) independent police investigation corroborates the informant's statements, (3) some basis for the informant's knowledge is demonstrated, or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted. Id. (citation omitted). However, these examples are not exclusive, and "[d]epending on the facts, other considerations may come into play in establishing the reliability of the informant or the hearsay." Id.

> With regard to anonymous sources, our supreme court has stated:

> Use of anonymous informants to establish probable cause often presents heightened reliability concerns. Because there is no possibility of criminal liability for filing a false police report, the informant has no incentive to be truthful. Anonymity effectively shields from scrutiny any possible ulterior motives; the situation is rife with the potential for pranks and mischief. Accordingly, some corroboration of the accusations is all the more essential when the informant is anonymous. At the same time, anonymous tips can provide important information enabling police to apprehend suspects who otherwise might escape detection. A balance must be struck between these considerations. As Gates put it: "While a conscientious assessment of the basis for crediting [anonymous] tips is required by the Fourth Amendment, a standard that leaves virtually no place for anonymous citizen informants is not."

Jaggers v. State, 687 N.E.2d 180, 182-83 (Ind. 1997) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)) (other citations omitted).

Most important in this case, the anonymous and confidential informants statements that Fuqua was dealing cocaine are corroborated by the evidence the detectives discovered during the trash pull. As stated in the probable cause affidavit, the detectives found

> two glass pipes, which are referred to as crack pipes or narcotics paraphernalia. Three separate empty boxes of Arm and Hammer baking soda. Baking soda is commonly used in cooking powdered cocaine into

12

> crack cocaine. Finding three separate empty boxes of baking soda is consistent with someone preparing large quantities of crack cocaine.
>
> Also in the trash were several clear plastic sandwich baggies and also an empty box of sandwich baggies. Several of the sandwich baggies had [] a white residue in it that field-tested positive for cocaine.

Ex. Vol., State's Ex. 1.

Also, the detectives personally observed activity consistent with drug dealing during their surveillance of Fuqua's residence. They saw two men walking back and forth on the street between Fuqua's residence and nearest street corner, and, based on their experience and training, believed that the two men were acting as lookouts. Also, the detectives observed that on separate occasions, when two vehicles arrived at Fuqua's residence, a driver or passenger of each vehicle entered Fuqua's home and left the residence less than ten minutes later. The detectives believed this activity was consistent with drug dealing. Another vehicle parked in front of Fuqua's residence was registered to an individual who had a record of drug arrests. The detectives also observed Fuqua's presence at the residence.

The anonymous informant and McCarter stated that Fuqua and Holman (a.k.a "Petey") were partners in dealing cocaine. Their statements were corroborated at least in part by the detective's observation of Holman's presence at Fuqua's home. The detectives also saw Fuqua drive away in the vehicle that Holman arrived in. Finally, Detective Engelman corroborated the informants' statements that Holman was a cocaine

13

dealer.[4] As recounted in the probable cause affidavit, the detective conducted a controlled buy with Holman where a confidential informant purchased 4.3 grams of crack cocaine from Holman on October 20, 2011.

The evidence from the trash pull and the detectives' personal observations corroborate important information provided by the anonymous and confidential informants. Therefore, the detectives took the necessary steps to establish the reliability and credibility of the informants. We conclude that the totality of the circumstances personally known to the detectives (as described in the affidavit) sufficiently corroborated the informants' hearsay statements. Under the facts and circumstances before us, the search warrant was supported by probable cause. For this reason, the trial court did not abuse its discretion when it admitted the evidence seized during the execution of the search warrant for Fuqua's residence.

**Conclusion**

We conclude that the investigating detectives had reasonable suspicion to search Fuqua's trash, and that the subsequent search warrant was supported by probable cause. For this reason, the trial court acted within its discretion when it admitted evidence seized during execution of the search warrant.

Affirmed.

KIRSCH, J., and CRONE, J., concur.

---

[4] We note that the law enforcement officer's affidavit in support of the search warrant application contained a significant omission that should have been disclosed: namely, the fact that the confidential informants cited in the affidavit had been arrested for cocaine dealing and faced criminal prosecution. A magistrate should know of the potential bias resulting from such fact when making the decision whether to issue a search warrant. Here, because of the remaining facts set forth in the affidavit were sufficient, the omission was not material. In another case, it may be.

14